**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **CRIMINAL INDICTMENT** |
| | : | |
| **DAVID DIAZ,** | : | **NO. 1:09-CR-037-WBH/AJB** |
| | : | |
| **Defendant.** | : | |

**ORDER FOR SERVICE OF**
**REPORT AND RECOMMENDATION**

Attached is the Report and Recommendation ("R&R") of the United States

Magistrate Judge made in accordance with 28 U.S.C. § 636(b)(1) and

N.D. Ga. CrR. 58.1(A)(3)(a), (b). A copy of the R&R and this order shall be served

upon counsel for the parties.

Pursuant to 28 U.S.C. § 636(b)(1), each party may file written objections to the

R&R within **fourteen (14)** days of service of this Order. Should objections be filed,

they shall specify with particularity the alleged error(s) made (including reference by

page number to the transcript if applicable) and shall be served upon the opposing

party. *See United States v. Gaddy*, 894 F.2d 1307, 1315 (11th Cir. 1990). The party

filing objections will be responsible for obtaining and filing the transcript of any

evidentiary hearing for review by the District Court. If no objections are filed, the

R&R may be adopted as the opinion and order of the District Court and any appellate review of factual findings will be limited to a plain error review.  *United States v. Slay*, 714 F.2d 1093 (11th Cir. 1983).

Pursuant to 18 U.S.C. § 3161(h)(1)(H), **the above-referenced fourteen (14) days allowed for filing objections is EXCLUDED from the computation of time under the Speedy Trial Act ("the Act"), whether or not objections are actually filed.**  If objections to this R&R are filed, the Clerk is **DIRECTED** to **EXCLUDE** from the computation of time all time between the filing of the R&R and the submission of the R&R, along with any objections, responses and replies thereto, to the District Judge.  18 U.S.C. § 3161(h)(1)(D), (H); *Henderson v. United States*, 476 U.S. 321, 331 (1986);  *United States v. Mers*, 701 F.2d 1321, 1337 (11th Cir. 1983).  The Clerk is **DIRECTED** to submit the R&R with objections, if any, to the District Court after expiration of the above time period.

**IT IS SO ORDERED and DIRECTED**, this  30th   day of   December  , 2010.

_____
**ALAN J. BAVERMAN**
**UNITED STATES MAGISTRATE JUDGE**

2

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | |
| | **:** | |
| **v.** | **:** | **CRIMINAL INDICTMENT** |
| | **:** | |
| **DAVID DIAZ,** | **:** | **NO. 1:09-CR-037-WBH/AJB** |
| | **:** | |
| **Defendant.** | **:** | |

### UNITED STATES MAGISTRATE JUDGE'S
### FINAL REPORT AND RECOMMENDATION

Before the Court is Defendant David Diaz's motion to open record and present additional evidence in support of his motion to suppress. [Doc. 81]. The government has filed a response in opposition. [Doc. 87]. For the following reasons, the undersigned **RECOMMENDS** that the motion be **DENIED**.

### *INTRODUCTION*

On January 27, 2009, a federal grand jury in this District charged that on November 1, 2005, Diaz committed the following three crimes: (1) possession of firearms affecting commerce after previous convictions for felonies (Count One); (2) possession of marijuana with intent to distribute (Count Two); and (3) possession of firearms in furtherance of the drug trafficking crime charged in Count Two (Count Three). [Doc. 1]. After arraignment, among other motions, Diaz moved to

suppress evidence and statements stemming from his November 1, 2005, arrest at the

Metro Inn in Atlanta, Georgia.  [Docs. 13, 16].

The Court held an evidentiary hearing on the motion on June 15, 2009, [Doc. 50

(hereinafter "T2")].  In a Report and Recommendation ("R&R") dated October 9, 2009,

the Court found the following facts:

> In the evening of November 1, 2005, Atlanta Police Department
> (APD) Officer Damen Scott was at the Metro Inn on Armor Drive in
> Atlanta.  T2:6, 35.  The Metro Inn was a short-stay hotel, where patrons
> paid by the week.  The Metro Inn was in a high-crime area, and there were
> many reports of prostitution and drug sales at that location.  T2:6.  In
> 2005, Scott worked the 3:00 p.m. to 11:00 p.m. shift.  T2:5-6.  Scott was
> called to the Metro Inn four to five times a day during a routine patrol in
> the three years that the Metro Inn was open.  T2:28.  Although the hotel
> usually handled most incidents itself, Scott, as part of his police duties,
> assisted employees of the hotel when they issued trespass warnings or
> escorted persons from the premises.  These incidents usually occurred
> after a patron did not pay rend and the hotel's security officer either called
> 911 or flagged down an officer for assistance.  T2:7.

> On this occasion, Scott and his back-up, APD Officer B. Grimes,
> were answering another call at the front desk of the hotel when a Metro
> Inn security officer approached them.  T2:8, 22, 24.  The security officer
> was dressed in his uniform of a white shirt, blue pants and gold security
> badge.  T2:8.  He stated that he was trying to give someone a trespass
> warning to get that person out of the hotel and wanted the officers'
> assistance.  T2:8, 23.  A trespass warning is a notice to the patron to leave
> the hotel.  T2:25.  The guard advised that he was trying to evict a patron,
> but when he attempted to serve a trespass warning on him, the patron ran

2

back to the room.  T2:8, 24.[1]  The guard stated that the patron was a light-skinned man and he knew which room he was in.  T2:25, 47.[2]  The guard pointed to the room.  T2:8.  (The guestroom entrances face the outside. T2:24).  After Scott and Grimes finished with their initial call, they followed the guard to room 2071 on the second floor.  T2:8-9, 23, 26. Prior to going to the room, Scott did not know to whom the room was registered.  T2:26.  Neither the officers nor the security guard had a key to the room.  T2:29.  The officers were in uniform and armed but their weapons were holstered.  T2:37.  (The security guard was unarmed. T2:37).

The officers and the security guard approached the room.  The curtains were drawn on the front window, so they could not see inside the room.  T2:30.  No noise was heard coming from the room.  T2:31.  Scott knocked once on the door.  T2:9, 30.  Grimes stood to Scott's left, and the security guard stood behind Scott.  T2:32.  Defendant Diaz immediately opened the door.  T2:9, 30.  Diaz appeared to be coherent and not under the influence of any intoxicants.  T2:10, 30.  Diaz opened the door just enough so that his body blocked the view of the room, but his entire body was visible.  T2:9, 31.  Scott asked the security guard whether Diaz was the person about whom he was talking and the guard replied affirmatively. T2:29.  Scott asked Diaz if he was okay, and Diaz replied that he was. T2:10, 33.  He appeared to understand Scott's question.  T2:10.  Diaz was dressed and did not appear as if he had been sleeping.  T2:31.

Scott testified on direct examination and on cross-examination that he told Diaz that the security guard was there for a trespass warning and that the hotel staff wanted him to leave.  T2:10, 34.  On re-direct examination, Scott testified that the security guard told Diaz he had a trespass warning and that he needed him to leave the hotel, T2:47,

---

[1]    On this occasion, Scott was unaware of the underlying reason why the hotel was seeking to evict this person.  T2:23.

[2]    Both Scott and the security guard are African-American.  T2-49.

3

followed by Scott telling Diaz that all he needed to do was gather his stuff and he can walk out of the hotel.  T2:47.  Diaz responded, "Okay."  T2:34.

Scott then asked Diaz if they could step inside the room, and Diaz replied yes, without hesitation.  T2:10, 33.  Diaz stepped aside so Scott could enter, and opened up the door so that Scott could step in.  T2:34. Diaz then went into the room and "started getting himself together" by gathering his belongings.  T2:10, 33, 36.  Grimes and Scott stood at the door of the room, which was now wide open.  T2:10-11, 36.  Scott testified that their standing in the doorway was a courtesy for both the hotel and the patron, to make sure the patron did not damage the room and that the hotel staff did not damage the patron's belongings.  T2:11.  The security guard remained outside the room.  T2:27.

Upon stepping into the room, Scott smelled marijuana.  T2:12, 39. Scott also  immediately noticed two small caliber pistols sitting on the night stand between the two beds on the left side of the room.  T2:11-12, 36.  On direct examination, Scott testified that after seeing the guns he asked Diaz to whom the pistols belonged, and Diaz replied that he did not know because "a lot of people come in and out the room."  T2:12.  On cross-examination, Scott testified as follows:

Q.  . . . You didn't ask him any questions about the gun [*sic*]?
A.  No?.
Q.  So he just started talking?
A.  No.  Oh, excuse me.  We did ask him who the guns belong to, and he said he didn't know, a lot of people come in and out of the room.
Q.  That was in relation to the guns?
A.  Yes, ma'am.
Q.  Okay.  And when did you ask him that question in relation to the guns?
A.  When we placed him under arrest.

4

T2:42-43.  On redirect examination, Scott testified that he asked Diaz about the guns before he saw the marijuana on the bed and before he placed Diaz under arrest.  T2:48.  Scott also testified that at first he was not "concerned about the guns because in Georgia it's legal to have a gun."  T2:48.

Within a few minutes, Scott also saw an opened white shopping bag on the bed closest to the door.  T2:11-12, 39, 40.  The bag appeared to contain loose marijuana.  T2:12, 42.  There were other empty but crushed shopping bags in the room as well.  T2:41.

Diaz was advised he was under arrest for the marijuana and the pistols, and he was handcuffed and seated on the bed closest to the door.  T2:13, 40, 41.  Grimes blocked the door.  T2:40.  The officers did not ask Diaz any questions about the marijuana, but Diaz proceeded to tell them that more marijuana was in the dresser drawer and refrigerator.  T2:13.  Scott opened the dresser drawer and located two large bags full of baggies containing marijuana, along with three crack pipes.  Inside the refrigerator was a white pillow case containing approximately two pounds of wet marijuana.  T2:13-14.  Diaz stated he told them where everything was so that his girlfriend would not get in trouble.  T2:15.  Scott did not see the girlfriend or locate any female belongings in the hotel room.  T2:20-21, 39.

One of the pistols was loaded, and 18 rounds of ammunition, which fit both guns, were found in the drawer of the night stand.  T2:15-16.

The officers bagged up Diaz's clothing and gave it to the hotel, which had a policy of maintaining the clothing until the patron returns.  T2:16-17.

Diaz was placed in Scott's patrol car between 40 minutes and 1 hour after his arrest.  T2:44.

[Doc. 58 at 12-18].

5

Based on these facts the Court recommended that the motion to suppress evidence be denied because (1) the officers' approach and knocking on Diaz's hotel room door required neither reasonable suspicion nor probable cause, *id.* at 22; (2) Diaz voluntarily consented to Scott's entry into his hotel room, *id.* at 48; (3) once lawfully inside the room, Scott observed the pistols and then the marijuana in plain view; *id.*; and (4) probable cause existed to seize the marijuana and firearms and arrest Diaz. *Id.* at 50.[3]

On December 2, 2009, the District Court overruled Diaz's objections to the R&R and adopted the R&R as its order. [Doc. 63 at 11]. On the same date, the District Court scheduled Diaz's trial for January 11, 2010. [Dkt. Entry 12/02/2009]. On January 11, 2010, at a hearing on Diaz's change of plea, Diaz expressed reticence in accepting the plea agreement, so the District Court referred the case to the undersigned for determination of whether defendant needed new appointed counsel. [Doc. 70]. At a subsequent January 25, 2010, hearing, Diaz was afforded new counsel. [Doc. 71].

On January 26, 2010, the Court appointed new counsel to represent Diaz. [Doc. 72]. On June 4, 2010, new counsel moved for CJA funds to hire an

---

[3]     The Court also recommended that Diaz's statement about who owned the firearms be suppressed, [Doc. 58 at 54], but that Diaz's statements about where other marijuana was located in his hotel room not be suppressed. *Id.*

6

investigator, [Doc. 75], and the District Court decertified the case ready for trial and referred the case to the undersigned for disposition of the motion.  [Doc. 76].  The undersigned granted the motion for funds on June 15, 2010.  [Doc. 77].

On August 16, 2010, Diaz filed his pending motion, [Doc. 81].

### CONTENTIONS OF THE PARTIES

In his motion to reopen, Diaz states that his investigator located and interviewed Joseph Battle, the security guard who accompanied the officers to Diaz's hotel room and Julie Nelson, Diaz's girlfriend who had accompanied Diaz to the room.  The investigator also interviewed Diaz.  Diaz states that his investigator did not locate Nelson until July 27, 2010.  (The motion is silent as to when the investigator located Battle.)  Diaz proffers that if called to testify, Battle would testify as follows:

a. He worked for the Metro Inn Extended Stay for 4-5 months;

b. He recalls accompanying the police to the room where Diaz was staying, but not the circumstances leading up to that point;

c. He recalls that two Atlanta police officers went to the room;

d. He stated he was the last up the stairs and the last to enter the room;

e. He does not recall details of how the police gained entry to Diaz's;

f. He was present in the room during the search;

7

g. He recalls seeing a personal use quantity of marijuana on the dresser next to the television;

h. He stated the police sat Diaz on the bed and began to search the room;

i. He stated that inside one of the drawers the police found a cookie tin which they removed and opened;

j. The tin contained two guns, bullets and a small scale;

k. He recalls the police searching the ceiling and other usual places;

l. He recalls the police located a pillow case (doesn't recall from where) which was about 1/4 full of marijuana.

[Doc. 81 at 4-5].  Diaz also states that if called as a witness Nelson would testify as follows:

a. At the time of the incident Diaz had been her boyfriend for approximately two years;

b. They lived together on a daily basis and were both involved in using drugs, moving from one extended stay motel to the next;

c. During their time together, she never saw Diaz with a handgun;

d. Chris Gorland and "Karen" l/n/u were friends they had known for a period of time.  They were also involved in a similar life style;

8

e. On the evening of November 1, 2005, Chris and Karen called, said they had rented a room and asked them to come over because they had no car, were hungry and wanted to go get something to eat;

f. She and Diaz drove to the Metro Inn and went directly to their room, without contact with anyone at the registration desk or the on-site security personnel;

g. When they arrived the room was a mess, with bags and clothes scattered everywhere.  She only stayed for a few minutes, then left with Chris and Karen to get something to eat.  Diaz remained in the room to take a shower;

h. While they were gone she received a telephone call from Diaz. At first she didn't understand, but then realized Diaz was using the speaker phone feature of his cell phone to tell her that the police were there and he was being arrested;

i. Later, she returned to the Metro Inn, went to the front desk and asked if she could remove their personal belongings from the room.  The room was unoccupied, but had been "trashed," drawers left open and the mattress half off the bed;

9

j. When she saw a small portable fire safe that had been broken into on the floor in the corner of the room, she decided it was "time to go." She retrieved one duffel bag that belonged to Diaz and left;

k. Nelson has received counseling and treatment for drug addiction and has been able to turn her life around. She returned to school completing an Associate in Arts, Associate in Science and Associate Addiction Professional degrees. For the past two years she has been employed as a client services representative at the detoxification center for the homeless in the St. Petersburg, Florida area.

[*Id.* at 5-6]. Further, Diaz states that if he were called as a witness, he would testify that he never granted permission to the officers to enter his room and that the hand guns were not in plain view as asserted by Officer Scott, rather they were located in a tin type container in a night stand by the bed. [*Id.* at 6].

Diaz argues that Battle's testimony would controvert Scott's testimony that the guns were in plain view. He further argues that his own testimony that he did not consent to the officers' entry into the room and Nelson's testimony that she did not see Diaz in possession of the weapons "raises a legitimate question about the accuracy/credibility of Officer Scott's version of events." [*Id.* at 7].

10

Diaz also argues the following as to why he could not present these witnesses at the original hearing:

> Diaz can only assume his original attorney simply did not have either or both the time or resources to locate and interview Mr. Battle and Ms. Nelson.  It is unknown if these witnesses were available at the time of the original suppression hearing in May and June 2009.  It is however known that both are presently available and will be subpoenaed to testify if the court will grant this request.

[*Id.* at 7-8].

In opposition to the motion, the government first argues that Diaz's motion is in essence a motion for reconsideration and he has failed to show sufficient prejudice to justify reopening the proceedings.  [Doc. 87 at 3].  It further argues that the Court's local rules provide that motions for reconsideration should be filed only when absolutely necessary and in any event within 10 days of the entry of the order complained of.  *Id.*

The government next argues that a motion for reconsideration may not be used to convince the court that it could have done better, nor to re-present arguments previously heard and dismissed, to repackage a claim to see if the count has changed its mind, or to offer new theories or evidence which could have been presented earlier without a reason why they could have not been timely raised.  *Id.* at 4-5.

11

The government also claims that there are no extraordinary circumstances that warrant reopening the evidence but rather Diaz now has witnesses to support his motion. It argues that Battle's proposed testimony does not shed any light on Diaz's consent to search and points out that Diaz's proffer of Battle's testimony states that he does not recall how the officers gained entry into the room. [*Id.* at 6]. It further notes that Diaz's motion is silent as to why he did not call Battle at the initial hearing. [*Id.* at 6-7].

As to Nelson, the government argues that Nelson's proposed testimony does not warrant reconsideration/reopening because it offers no insight into Diaz's consent to search the hotel room. [*Id.* at 7]. The government also argues that Diaz's testimony directly contravenes the Court's factual findings and is comprised of information that Diaz possessed (but failed to present) at the time of the evidentiary hearing. [*Id.* at 7-8].

Next, the government argues that Diaz's motion is untimely because he waited almost 6 months after new counsel was appointed to file a motion for investigator funds, and did not file the motion for reconsideration until almost 2 months after those funds were approved. [*Id.* at 8-9].

Finally, the government argues that it would be prejudiced if the evidence was reopened, because it has an interest in finality. [*Id.* at 9].

12

### DISCUSSION

The Court has discretion whether or not to re-open the evidentiary record on Diaz's motion to suppress.   *See United States v. Martin*, No. 10-10923, 2010 WL 4104674, *1 (11th Cir. Oct. 20, 2010); *United States v. Simms*, 385 F.3d 1347, 1356 (11th Cir. 2004).   In *Simms*, the Eleventh Circuit affirmed the district court's denial of a defendant's motion to reopen a suppression hearing based on new evidence because the "new evidence" was not inconsistent with the evidence presented at the suppression hearing.   *Id.*; *see also United States v. Muhammad*, 340 Fed. Appx. 548, 550 (11th Cir. 2009) (affirming denial of motion to reconsider because new testimony would not have led to a different outcome on the motion to suppress).

The Court agrees with the government that Diaz's motion is in the nature of a motion for reconsideration.   *See United States v. Odeh (In re Terrorist Bombings of U.S. Embassies in E. Afr.)*, 552 F.3d 177, 196 (2d Cir. 2008) (holding that a motion to reopen a suppression hearing is treated the same as a motion for reconsideration, and both are within the trial court's discretion to grant).   "Generally, a motion for reconsideration should not be used to reiterate arguments that have been made previously, but such a motion should be reserved for extraordinary circumstances, such as the discovery of new evidence, an intervening development or change in the law, or

13

the need to correct a clear error or prevent a manifest injustice." *Adler v. Wallace Computer Servs., Inc.*, 202 F.R.D. 666, 675 (N.D. Ga. 2001) (Story, J.).  Granting a motion to reopen a suppression hearing is appropriate where there is new evidence relevant to the issue of suppression.  *See United States v. Rabb*, 752 F.2d 1320, 1323 (9th Cir. 1984) (reopening of suppression hearing is proper "if the record reveals matters" which affect the suppression determination); *United States v. Tzakis*, 736 F.2d 867, 872 (2d Cir. 1984) (upholding denial of motion to reopen "[i]n the absence of any further factual developments").  " '[C]ourts should be extremely reluctant to grant reopenings.' " *United States v. Carter*, 374 F.3d 399, 405 (6th Cir. 2004) (citations omitted).  The party requesting reopening must explain its failure to present the evidence initially, and a court must evaluate that explanation and determine if it is both reasonable and adequate to explain why the moving party initially failed to introduce evidence that may have been essential to meeting its burden of proof.  *See Carter*, 374 F.3d at 406; *see also United States v. Kithcart*, 218 F.3d 213, 219-20 (3d Cir. 2000).  Generally, absent any new evidence or evidence that was unobtainable before the original suppression hearing, or any new issues that became relevant since the initial hearing, the reopening of a suppression hearing is unwarranted.  *See United States v. Watson*, 391 F. Supp. 2d 89, 94-95 (D.D.C. 2005).

14

The Court rejects Diaz's motion for the following reasons.  First, there is no explanation why Battle or Nelson could not have been called at the original hearing.[4] Second, Diaz's motion and accompanying brief contain no affidavits of either Battle or Nelson such that the Court has some assurance that they would in fact testify to the facts proffered in the papers.  At a minium, the motion should have been  accompanied by an affidavit from the investigator setting forth what these witnesses told him and outline what the investigator believed they would testify to if called as witnesses. *See* N.D. Ga. R. 7.1(A)(1) ("If allegations of fact are relied upon, supporting affidavits must be attached to the memorandum of law.") (made applicable to criminal cases by N.D. Ga. LCrR 12.1(B)).  As a result, the proffered testimony of Battle and Nelson is not properly before the Court.

As to Diaz's proffered testimony (which similarly is defective for not being in the form of an affidavit), he sets forth no explanation why this evidence was not available to him at the time of the initial hearing on this motion.  *See United States v. Green*, No. 00-1771, 2001 WL 1312940, *1 (2d Cir. Oct. 23, 2001) (concluding that

---

[4]      In fact, although the hearing on the motion to suppress was supposed to be held on May 7, 2009, it was continued until June 15, 2009, because Officer Scott had a death in the family. [*See* Doc. 38 at 2-4].  As a result, Diaz had at least one additional occasion to obtain the testimony of these missing witnesses or to ask the Court for more time to obtain their testimony.

AO 72A
(Rev.8/8
2)

district court appropriately denied motion to reopen the suppression hearing on the basis of "newly discovered evidence," where the putative new evidence was defendant's own notes about when he took insulin and had been continuously in his possession).

Third, even if the Court treats the proffers of Battle and Nelson as properly before the Court, re-opening the suppression hearing to allow them to testify is not warranted.  Initially, the Court rejects the main premise of the government's argument as to why Battle's proffered testimony is defective, that is, that Battle does not address Diaz's consent to search.  However, the issue at the hearing was whether Diaz consented to the officers' *entry* into the hotel room, after which Officer Scott claimed to have seen firearms in plain view on the night stand, smelled marijuana and then observed a bag of marijuana on the bed.

Notwithstanding the fallacy in the government's argument, Battle's proposed testimony does not warrant that the evidentiary record be reopened because this proffered testimony does not effect the suppression determination.  Neither Battle's (nor, as will be shown, Diaz's) proffered testimony addresses Scott's testimony that he observed a bag of marijuana on the bed, thus giving rise to probable cause to arrest Diaz.  Nor does Battle's (or Diaz's) proffered testimony refute Scott's testimony that

16

Diaz volunteered that additional marijuana was in the dresser drawer and in the refrigerator, and that Diaz told Scott where the marijuana was so that his (Diaz's) girlfriend would not get in trouble.  T2:13-15.  Thus, even if Battle's proffered testimony was admitted, and the Court concluded that the firearms were not in plain view on top of the night stand, the weapons would lawfully have been discovered when Scott opened the night stand in conducting a search incident to a lawful arrest.  *United States v. Flores*, 380 Fed. Appx. 921, 923 n.1 (11th Cir. 2010).

Since the custodial arrest of a suspect based on probable cause is a reasonable intrusion under the Fourth Amendment, a search incident to the arrest requires no additional justification.  *United States v. Robinson*, 414 U.S. 218, 235 (1973).  In fact, a full search incident to a lawful arrest is not only a "reasonable" search under the Fourth Amendment, it is  also an exception to the warrant requirement.  *Id.* at 234.  It is designed to ensure the protection of law enforcement officers as they conduct an arrest.  *See Chimel v. California*, 395 U.S. 752, 763 (1969).  "When an arrest is made, it is reasonable for the arresting officer to search the person arrested in order to remove any weapons that the latter might seek to use in order to resist arrest or effect his escape.  Otherwise, the officer's safety might well be endangered, and the arrest itself frustrated."  *Id.* at 762-63.  Under the same rationale, the Supreme Court in *Chimel*

17

further authorized officers to search for and seize evidence in the immediately surrounding area "into which an arrestee might reach in order to grab a weapon or evidentiary items." *Id.* at 763.   A search incident to arrest may extend into the immediately surrounding area because "[a] gun on a table or in a drawer in front of one who is arrested can be as dangerous to the arresting officer as one concealed in the clothing of the person arrested." *Id.*   However, the "search incident to arrest" is a limited exception; it "places a temporal and a spatial limitation on searches incident to arrest, excusing compliance with the warrant requirement only when the search 'is substantially contemporaneous with the arrest and is confined to the immediate vicinity of the arrest.' " *New York v. Belton*, 453 U.S. 454, 465 (1981) (citations omitted). Thus, officers may only search areas "within [the arrestee's] immediate control" construed as "the area from within which he might gain possession of a weapon or destructible evidence." *Chimel*, 395 U.S. at 763.   As the Court stated, "[t]here is no comparable justification, however, for routinely searching any room other than that in which an arrest occurs - or, for that matter, for searching through all the desk drawers or other closed or concealed areas in that room itself." *Id.*

This rule is applicable even when the defendant is restrained.  *United States v. Jones*, 218 Fed. Appx. 916, 919 (11th Cir. 2007) (upholding search of bag in hotel room

18

incident to arrest even though defendant handcuffed and recognizing other courts' similar conclusions) (citing *United States v. Romero*, 452 F.3d 610, 619-20 (6th Cir. 2006) (explaining that search of night stand was permissible because night stand would have been within handcuffed defendant's reach had he not been handcuffed), and *United States v. Queen*, 847 F.2d 346, 349, 353-54 (7th Cir. 1988) (permitting search where arrestee was handcuffed behind his back and guarded by two armed officers before search of closet three feet away)); *see also United States v. Hernandez*, 941 F.2d 133, 137 (2d Cir. 1991) (seizure of gun found between mattress and box spring within defendant's reach valid though defendant handcuffed); *United States v. Hehnstetter*, 56 F.3d 21, 23 (5th Cir. 1995) (seizure of automatic weapon protruding from under chair where defendant was sitting following arrest valid though defendant handcuffed); *United States v. Lucas*, 898 F.2d 606, 609-10 (8th Cir. 1990) (search of closed kitchen cabinet valid, though out of arrestee's reach, because he reached for cabinet door during scuffle preceding arrest and 2 of arrestee's friends sat unhandcuffed at nearby table). *But see, e.g., Holmes v. Kucynda*, 321 F.3d 1069, 1083 (11th Cir. 2003) (search of bedroom invalid as incident to arrest because not contemporaneous with, or conducted in vicinity of, arrest).

AO 72A
(Rev.8/8
2)

Even with Battle's proposed testimony, Diaz would still have been arrested for possession of marijuana because his proposed testimony does not question whether the marijuana was in plain view.  Also, Battle's proposed testimony does not alter the evidence that following the arrest, Diaz was handcuffed and placed on the bed closest to the door.  Because the night stand was next to the bed upon which Diaz was seated, it was within his reach and properly searched incident to Diaz's arrest.  In fact, Officer Scott testified that the night stand was searched (and Diaz has never specifically raised a challenge to the search of the night stand) and 18 rounds of ammunition, which fit both guns, were found in the drawer of the night stand.  T2:15-16.  Therefore, even if the firearms were located in a tin inside the night stand, they lawfully would have been located pursuant to the search incident to his arrest.

Nelson's proposed testimony also is deficient and does not mandate reopening the evidentiary record.  She was not present at the time of the incident, so therefore she cannot testify as to what occurred there.  The fact that she never saw Diaz with firearms is irrelevant as to whether the firearms were constitutionally seized.  Moreover, her proffered testimony calls into question whether Diaz actually had a legitimate Fourth Amendment expectation of privacy in the premises.

20

Finally, Diaz's proposed testimony as whether he gave permission to the officers to enter the room is conclusory and thus is accorded no weight. *Cf. Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985) ("[C]onclusory allegations [in an affidavit] without specific supporting facts have no probative value.").  The problem with the current statement attributed to Diaz is that he does not explain the circumstances surrounding the officers' entry in more detail, i.e., what actions made their entry unlawful because it was without his permission.  Moreover, there is no reason why Diaz could not have proffered his theory that the guns were inside a tin located inside the night stand by way of cross-examination of the witnesses at the initial hearing.  The Court finds no questioning of Officer Scott by defense counsel which makes it likely that Diaz's present claim as to the location of the firearms was not simply a mirroring of Battle's proffered testimony. And, as noted in addressing Battle's proposed testimony, even if Diaz now claims the firearms were in the tin inside the night stand, they would have been discovered during a search incident to his arrest. Therefore, the firearms would have been lawfully discovered.

As a result, the Court concludes that Diaz is not entitled to reopen the evidentiary record to present additional testimony on his motion to suppress.

21

*CONCLUSION*

For all of the above reasons, the undersigned **RECOMMENDS** that Diaz's motion to open record and present additional evidence in support of his motion to suppress, [Doc. 81], be **DENIED**.  The Court has again ruled on all matters and motions referred to it.  Accordingly, this case is **CERTIFIED READY FOR TRIAL**.

**IT IS SO RECOMMENDED AND CERTIFIED**, this the 30th day of December, 2010.

_____
**ALAN J. BAVERMAN**
**UNITED STATES MAGISTRATE JUDGE**

22